## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CATO CAPITAL LLC,                          )
                                            )
            Plaintiff,                      )
                                            )
        v.                                  )
                                            )   Civil Action No. 09-549 (GMS)
HEMISPHERX BIOPHARMA, INC., and             )
THE SAGE GROUP, INC.                        )
                                            )
            Defendants.                     )
                                            )

## **MEMORANDUM**

## I. **INTRODUCTION**

The plaintiff, Cato Capital LLC ("Cato Capital"), brought this action for damages and attorneys' fees against Hemispherx Biopharma, Inc. ("Hemispherx") alleging breach of contract, and fraudulent inducement, and against The Sage Group, Inc. ("Sage") alleging fraud and intentional interference with contractual relationship.[1] (D.I. 46.) Cato Capital claims entitlement to damages and attorneys' fees.

The court held a three-day bench trial in this matter from March 4, 2013 through March 6, 2013. After the trial, each party submitted Proposed Findings of Fact and Conclusions of Law. (D.I. 185; D.I. 186.) Pursuant to Federal Rule of Civil Procedure 52(a), and after having considered the entire record in this case and the applicable law, the Court makes the following findings of fact and conclusions of law.

## II. **FINDINGS OF FACT**

### A. The Parties

Plaintiff Cato Capital is a limited liability company in the investment banking business

---

[1]     Hemispherx and Sage will be known collectively as "the Defendants."

1

that was formed in mid-2005. (D.I. 157, Ex. A at ¶ 1; D.I. 185 at ¶ 1; D.I. 186 at ¶ 1.) Solomon Lax ("Mr. Lax") is one of Cato Capital's Managing Directors. (*Id.*) Defendant Hemispherx is a publicly traded biopharmaceutical corporation and Dr. William Carter ("Dr. Carter") is its Chief Executive Officer, Chief Science Officer, Chairman, and President. (D.I. 157, Ex. A at ¶ 2; D.I. 185 at ¶ 2; D.I. 186 at ¶ 2.) Defendant Sage is a consulting firm that advises healthcare and life science companies regarding transactions and strategy. (D.I. 157, Ex. A at ¶ 3; D.I. 185 at ¶ 3; D.I. 186 at ¶ 3.) Since 1995, Sage has provided Hemispherx with consulting services and assistance in locating investors to fund and promote Hemispherx's products. (D.I. 157, Ex. A at ¶ 5; D.I. 185 at ¶ 4; D.I. 186 at ¶ 3.) Wayne Pambianchi ("Mr. Pambianchi") is an Executive Director of Sage, as is Douglas Hulse ("Mr. Hulse"). (D.I. 157, Ex. A at ¶ 3, 6; D.I. 185 at ¶ 3; D.I. 186 at ¶ 3.) Mr. Pambianchi acted as Hemispherx's representative in the negotiations, communications, and transactions from which the instant action arises. (D.I. 185 at ¶ 3; D.I. 186 at ¶¶ 15-16.)

## B. Beginning of the Business Relationship and Negotiation of the Engagement Letter

In October 2008, Mr. Hulse made the acquaintance of Kathleen Millier ("Ms. Millier"), a prospector for Cato Capital. (*Id.* at ¶ 6.) Ms. Millier had just joined Cato Capital and she was responsible for finding companies that might be looking for capital and bringing them to Cato Capital as clients. (D.I. 185 at ¶ 5; D.I. 186 at ¶ 4; Trial Transcript ("Tr.") at 234:12-16.) Mr. Hulse knew that Hemispherx was seeking financing, so he put Ms. Millier in touch with his partner, Mr. Pambianchi. (D.I. 157, Ex. A at ¶ 7.) Acting on behalf of Hemispherx as a facilitator, Mr. Pambianchi discussed Hemispherx's immediate need for capital with Ms. Millier. (D.I. 186 at ¶ 5; Tr. 249:23-250:6, 345:12-346:5.) Specifically, he informed Ms. Millier that Hemispherx was contemplating a transaction in which it would attract investors' interest, despite the difficult economy, by using its FDA-approved facility in New Jersey as collateral. (D.I. 186

2

at ¶ 6; Tr. 188:6-189:4, 250:2-6.)

On November 10, 2008, after speaking with Mr. Lax, Ms. Millier informed Mr. Pambianchi and Dr. Carter that Cato Capital believed the transaction was "doable" and "definitely in our sweet spot."[2] (Joint Exhibit ("JX") 17; D.I. 186 at ¶ 9.) A day later, on November 11, 2008, the negotiation of the Engagement Letter[3] commenced when Ms. Millier e-mailed Mr. Pambianchi the template that Cato Capital used for capital raise transactions. (D.I. 185 at ¶ 6; D.I. 186 at ¶ 14.) She had received this draft from Mr. Lax. (*Id.*) In the e-mail to which Ms. Millier attached the template, she wrote to Mr. Pambianchi that once the parties had executed the agreement and had agreed upon the talking points that Mr. Lax was to present to potential investors, they could expect a term sheet from an investor within a few weeks. (D.I. 186 at ¶ 10; Tr. 251:19-252:10.) While Ms. Millier expressed optimism to Mr. Pambianchi, Mr. Lax had reason to be less confident. At or about this time, Mr. Lax discussed the Hemispherx engagement with Michael Harstein ("Mr. Harstein"), a friend who he considered to be very knowledgeable about private investments in public entities ("PIPE") and indeed, "a hard-core PIPE guy." (D.I. 186 at ¶ 11; Tr. 181:19-182:22.) Mr. Harstein was pessimistic about the engagement, saying to Mr. Lax "[f]orget it, it will never happen. The market is very terrible." (*Id.*) Mr. Lax did not inform Hemispherx of his conversation with Mr. Harstein or of Mr. Harstein's strongly negative opinion of the engagement's likelihood of success. (D.I. 186 ¶ 12; Tr. 184:10-23.)

---

[2]     Ms. Millier testified at trial that by "doable" and "definitely in our sweet spot," she meant that Cato Capital was particularly interested in this sort of transaction because the hedge funds with which Cato Capital had dealt in the past had requested deals that could be secured by assets. (Tr. 239:10-240:12.) At this time, however, Cato Capital was relatively inexperienced with private investments in public entities ("PIPE") transactions and Ms. Millier acknowledged that, in November 2008, she had no personal experience with PIPE transactions. (Tr. 246:12-19.) Likewise, Mr. Lax admitted that, as of November 2008, Cato Capital had completed only one PIPE deal since it was created. (Tr. 142:15-143:22.)

[3]     The court will use the terms "Engagement Letter" and "Agreement" interchangeably to indicate the contract between Cato Capital and Hemispherx.

The parties negotiated the terms of the Engagement Letter from November 11, 2008 until November 19, 2008. (D.I. 185 at ¶ 6-7; D.I. 186 at ¶¶ 19-20.) Mr. Pambianchi served as Hemispherx's conduit during the negotiation. (D.I. 186 at ¶¶ 15-17; Tr. 351:10-18.) He transmitted drafts of the Engagement Letter to Dr. Carter, made revisions pursuant to Dr. Carter's instructions, and communicated both his own impressions and Dr. Carter's thoughts on the Engagement Letter to Mr. Lax and Ms. Millier. (*Id.*) Ms. Millier served a similar function on behalf of Cato Capital. (D.I. 185 at ¶ 6; D.I. 186 at ¶ 15; Tr. 237:15-25.) On November 24, 2008, Mr. Lax signed the final engagement letter on behalf of Cato Capital and Dr. Carter signed the letter on behalf of Hemispherx. (JX 26.)

## C. Terms of the Engagement Letter

The Engagement Letter is a non-exclusive contract, (D.I. 186 at ¶ 21; Tr. 215:9-14), the term of which extended from November 24, 2008 to March 24, 2009, with an additional eight-month tail period. (JX 26 at ¶¶ 2(b) and 3(a).) Paragraph 3(d) of the Engagement Letter's Terms and Conditions makes clear that the Engagement Letter is a fully integrated document that "contains all of the understandings between the parties hereto with reference to the subject matter hereof." Consequently, "[n]o party can rely or be bound by any understanding or statement, oral or otherwise, not specifically in this Agreement." (*Id.*)

Under the terms in the first section of the Engagement Letter, Cato Capital was to act as Hemispherx's "financial advisor and placement agent in connection with facilitating debt and equity financings for the Company and its subsidiaries. . . ." (*Id.*) In particular, Cato Capital was to "assist the Company in identifying potential investors and financing sources" and also provide the following services:

> (i)  Familiarizing itself...with the business operations, properties, financial condition, and prospects of the Company,

4

> (ii)   Screening and contacting prospective investors,
>
> (iii)  Assisting in negotiations with prospective investors, and
>
> (iv)   Advising and assisting the Company in structuring and pricing of placements or financings.

(*Id.* at ¶ 1.) Cato Capital was to render these services on a "'best efforts only basis" and

Cato Capital would "in its sole discretion, determine the reasonableness of its efforts and [would

be] under no obligation to perform at any level other than what it deem[ed] reasonable." (*Id.*)

The second section of the Engagement Letter, titled "Compensation for Services,"

governs the payment that Cato Capital was to receive in the event it fulfilled the Agreement's

requirements. (*Id.* at ¶¶ 2(a)-(c).) The paragraph states, in relevant part, that any fees due Cato

Capital were to be calculated as follows:

> (a)    Placement fees: In the event that Cato locates a source of capital for the Company...Cato will be entitled to a "Placement Fee." The Placement Fee will be the sum of the following components:
>
> (i)    A cash fee equal to 7% of the gross Proceeds that constitutes equity...
>
> (ii)   A cash fee equal to 7% of the gross Proceeds that constitutes participating...or subordinated debt; and
>
> (iii)  3.5% of the portion of the gross Proceeds that constitutes non-participating debt, such as convertible debt;
>
> (iv)   Warrants to purchase a number of shares of Securities equal to 7% of the value of equity or participating debt Securities placed by Cato...and

(JX 26 at ¶ 2(a).)

Paragraphs 2(b) and 2(c) of the Engagement Letter provide additional requirements with

which Cato Capital was mandated to comply in order to receive the fees detailed in paragraph

2(a):

> (b)    Payment of Fees: All applicable fees shall be payable, irrespective of any Services rendered or not rendered by Cato, with respect to any Transaction completed with any Cato Prospect during (i) the term of this Agreement or (ii) the eight month period (the "Tail Period") following the term of this Agreement. At the end of the term of this Agreement, Cato shall designate in writing

5

to the Company all Cato Prospects. Cato will only be entitled to Placement Fees for Transactions during the Tail Period completed with any of the listed Cato Prospects or their affiliates. Placement Fees shall be paid in cash at the time of the closing of the related Transaction, except as otherwise specifically provided in the definition of the term Proceeds in Section 5 below.

(c) All applicable fees and bonuses will only be due if a Transaction in fact closes with a third party introduced to the Company or its affiliates by Cato (a "Cato Prospect") and Cato understands that the Company is not under any obligation to close any Transaction. Following the execution of this Agreement, Cato will immediately provide Company with a list of Cato Prospects which will be immediately reviewed by Company and once agreed, Cato Prospects will be attached to this agreement as appendix A.

Paragraph 2(b) appeared in all drafts of the Engagement Letter and only the length of the tail period was modified during the negotiations. (D.I. 185 at ¶ 24; D.I. 186 at ¶¶ 30-31.) Paragraph 2(c) resulted from negotiations between Hemispherx and Cato Capital over Hemispherx's request that Cato Capital first seek and receive approval from Hemispherx before contacting a prospective investor with Hemispherx's name. (D.I. 185 at ¶ 22; D.I. 186 at ¶ 33; Tr. 93:7-95:18, 166:15-168:25, and 172:1-173:6.)[4]

## D. The Paragraph 2(c) List of Cato Prospects

On November 24, 2008, pursuant to paragraph 2(c) of the Agreement, Cato Capital e-mailed Mr. Pambianchi a list of prospective investors that Hemispherx had given Cato Capital approval to contact on Hemispherx's behalf.[5] (JX 25; D.I. 185 at ¶ 25; D.I. 186 at ¶ 40.) Cato Capital had never done business with any of the companies on its list of prospects and Mr. Lax

---

[4] The original version of paragraph 2(c) required Cato Capital to have a "strong relationship" with the prospective investors to be designated "Cato Prospects" and mandated Hemispherx to immediately inform Cato Capital "if any has been or soon will be contacted by Company or any of its representatives[.]" Cato Capital objected to this language and had it removed. (JX 20 at ¶ 2(c); D.I. 185 at FN 5; D.I. 186 at ¶¶ 35-36.)

[5] The list that Cato Capital and Hemispherx maintained and updated pursuant to paragraph 2(c) will henceforth be referred to as the "paragraph 2(c) list" in order to distinguish it from the list that the Engagement Letter required Cato Capital provide pursuant to paragraph 2(b).

had in fact obtained the list from his friend Mr. Harstein.[6] (Tr. 181:19-182:24.) Mr. Pambianchi forwarded the list to Dr. Carter and the list was appended to the Agreement. (*Id.*) The list consisted of 16 prospective investors, termed "Cato Prospects," including Hudson Bay Capital Management LP ("Hudson Bay") and Iroquois Capital ("Iroquois"). (D.I. 185 at ¶ 25; D.I. 186 at ¶ 41.) Days later, on November 30, 2008, Cato Capital identified five additional prospects, of which Hemispherx approved four, including Cranshire Capital LP ("Cranshire"). (JX 42; D.I. 185 at ¶ 27; D.I. 186 at ¶¶ 42-43.)

### E. Cato Capital's Efforts Regarding Iroquois, Hudson Bay, and Cranshire

#### 1. Iroquois

Before Mr. Lax contacted Iroquois, Iroquois was already familiar with Hemispherx because Iroquois had previously invested in Hemispherx through an equity transaction in 2004. (D.I. 186 at ¶ 64; Tr. 443:19-444:9.) In fact, Iroquois still owned shares of Hemispherx stock and warrants for Hemispherx stock when Mr. Lax contacted Iroquois. (*Id.*) Nonetheless, Dr. Carter agreed to let Cato Capital contact Iroquois because Dr. Carter was familiar only with Iroquois' equity side. (D.I. 186 at ¶ 65; Tr. 444:10-24.) He was under the impression that Mr. Lax had contacts at Iroquois that could facilitate a secured debt-based transaction. (*Id.*)

On November 30, 2008, Mr. Lax e-mailed Josh Silverman ("Mr. Silverman"), the co-founder and managing member of Iroquois, and Michael Gregory, an analyst at Iroquois. (D.I. 185 at ¶ 48; D.I. 186 at ¶ 47.) In the e-mail, Mr. Lax explained that Hemispherx "has a clean balance sheet with a [*sic*] FDA approved manufacturing plant and equipment that are currently unencumbered which are being offered as security for any convertible done." (JX 43; D.I. 185 at

---

[6] Mr. Lax testified at trial that he had attempted to convince Mr. Harstein to assist him with the Hemispherx transaction at its inception. (Tr. 181:19-182:24.) Given the state of the economy, however, Mr. Harstein was pessimistic about the likelihood of successfully securing capital for Hemispherx and refused Mr. Lax's offer. (*Id.*) In lieu of participating in the transaction, Mr. Harstein sent Mr. Lax a list of his own contacts and gave Mr. Lax permission to approach these contacts. (*Id.*) Thus, at the outset of the engagement, Mr. Lax was not familiar with the companies that Cato Capital designated as Cato Prospects.

¶ 48; D.I. 186 at ¶ 47.) Mr. Silverman agreed to meet with Hemispherx and Mr. Lax sent him a PowerPoint presentation in advance of the meeting. (*Id.*) On December 10, 2008, Mr. Silverman met with Mr. Lax and representatives from Hemispherx. (D.I. 185 at ¶ 48; D.I. 186 at ¶ 63.) About two weeks after the meeting, Iroquois made a proposal of $500,000 cash.[7] Both Hemispherx and Cato Capital agreed that the amount that Iroquois proposed was much too small, however, so Hemispherx rejected the offer. (D.I. 185 at ¶ 48; D.I. 186 at ¶¶ 67-68.) After Cato Capital informed Iroquois on December 26, 2008 that Hemispherx had rejected its offer, Cato Capital had no further contact with Iroquois. (D.I. 186 at ¶ 69; Tr. 206:11-14.)

## 2. Hudson Bay

On November 30, 2008, Mr. Lax sent to George Antonopoulos at Hudson Bay the same e-mail detailing the Hemispherx transaction that he had also sent to Iroquois. (JX 128; D.I. 185 at ¶ 49; D.I. 186 at ¶ 46.) When Mr. Antonopoulos did not respond, Mr. Lax called Mr. Antonopoulos, but was only able to reach his assistant, Deborah Wollenberg ("Ms. Wollenberg"). (D.I. 185 at ¶ 49; D.I. 186 at ¶¶ 49-50.) Ms. Wollenberg informed Mr. Lax that she was not sure whether Mr. Antonopoulos received Mr. Lax's e-mail, so Mr. Lax requested her e-mail address and then forwarded the e-mail to her. (*Id.*) Ms. Wollenberg dutifully forwarded the e-mail and Hemispherx's name to Mr. Antonopoulos. (JX 136; D.I. 185 at ¶ 49; D.I. 186 at ¶ 53.) After Mr. Lax forwarded the e-mail to Ms. Wollenberg on December 4, 2008, Cato Capital had no further contact with Hudson Bay. (D.I. 185 at ¶ 49; D.I. 186 at ¶ 54.) Mr. Lax testified that he never told anyone at Hemispherx that Hudson Bay had not responded to his attempts. (Tr. 205:4-19.)

## 3. Cranshire

On November 30, 2008, Mr. Lax sought permission from Mr. Pambianchi to contact five

---

[7] Mr. Lax claims that Iroquois also offered a $4.5 million equity line. (D.I. 185 at ¶ 48.)

additional prospects, including Cranshire. (JX 42; D.I. 185 at ¶ 27; D.I. 186 at ¶¶ 42-43.) After Mr. Pambianchi approved Cranshire, Mr. Lax e-mailed Keith Goodman ("Mr. Goodman") at Cranshire on December 4, 2008. (JX 47; D.I. 185 at ¶ 50; D.I. 186 at ¶ 48.) The e-mail that he sent was the same one he had sent Iroquois and Hudson Bay. (*Id.*) Mr. Lax called Mr. Goodman after sending the e-mail. At his deposition, Mr. Goodman stated that he understood Mr. Lax to be seeking "some type of secured transaction to put [Hemispherx's manufacturing plant in New Jersey] up as collateral." (Goodman Dep. 41:5-42:12.) Mr. Goodman also stated that he had already been introduced to this same transaction by another investment banker, Mid-South Capital, who had called Mr. Goodman before Mr. Lax did. (*Id.* at 25:9-26:16.) Mr. Goodman informed Mr. Lax that he had already seen the transaction and was not interested.[8] (*Id.* at 94:15-95:2; D.I. 46 at ¶ 17; D.I. 185 at ¶ 50; D.I. 186 at ¶ 59.) Although Mr. Goodman asked Mr. Lax to keep him updated if the terms of the transaction changed, neither Mr. Lax nor anyone else representing Cato Capital ever again contacted Cranshire regarding investing in Hemispherx. (D.I. 186 at ¶ 61; Tr. 198:12-199:2.) Mr. Lax never informed Hemispherx that Cranshire was not interested. (D.I. 186 at ¶ 62.) Instead, Mr. Lax wrote in an e-mail dated December 24, 2008 that: "Cranshire and Professional Traders will likely participate to some extent but not lead." (*Id.*; JX 85.)

## F. The Updated Cato Prospects List

In an e-mail to Mr. Pambianchi dated January 5, 2009, Mr. Lax identified three more

---

[8]     At trial, Mr. Lax testified that he believed Mr. Goodman meant that Mr. Goodman had been approached about a past deal, rather than the same transaction that Mr. Lax was proposing. (Tr. 196:18-197:3, 199:1-16.) This interpretation of Mr. Goodman's statement is, however, inconsistent with Mr. Goodman's own recollection. Mr. Goodman testified at his deposition that Mid-South Capital, had contacted him on Hemispherx's behalf just before Mr. Lax contacted him. (Goodman Dep. 35:5-21.) Notes that he took for his own use in November and December 2008 corroborate this. (JX 88.) Mr. Goodman also suggested during his deposition that when he informed Mr. Lax that he had already seen the deal, he made clear that the deal he had seen was the same deal that Mr. Lax was offering. (*Id.* at 94:22-24.) As he stated, he informed Mr. Lax "[t]hat I had already seen the transaction. That I had already rejected it." (*Id.*)

Cato Prospects and sought approval for them. (JX 54; D.I. 185 at ¶ 28; D.I. 186 at ¶ 70.) In the e-mail, Mr. Lax wrote: "If you can please confirm that these groups are permitted investors[,] I would appreciate it. They had not seen the transaction yet but may have been part of the other agents list." (JX 54; D.I. 186 at ¶ 71.) On January 6, 2009, Mr. Pambianchi approved the three prospective investors in an e-mail to Mr. Lax. (JX 54; D.I. 185 at ¶ 29; D.I. 186 at ¶ 73.) In the same e-mail, Mr. Pambianchi asked Mr. Lax to send him "your full list, updated" of all the Cato Prospects. (*Id.*) On January 7, 2009, Mr. Lax sent Mr. Pambianchi the complete list of all Cato Prospects. (JX 56; D.I. 185 at ¶ 30; D.I. 186 at ¶ 74.) The list included Iroquois, Cranshire, and Hudson Bay. (*Id.*)

On January 12, 2009, after receiving the list, Mr. Pambianchi sent an e-mail to Mr. Lax stating:

> I think you know there is another group that has been working on the same type of secured, convertible note financing. To avoid conflicts and respect everyone's efforts, I have annotated the list you sent a few days ago. There are very few overlaps and where there are, I suggest a split, the % being what I propose you get of your fees as agreed. I propose eliminating a few, as I have done with the other group, because they seem more engaged.

(JX 58; D.I. 185 at ¶ 31; D.I. 186 at ¶ 75.)

Mr. Pambianchi attached to the e-mail a mark-up of the list that Mr. Lax had e-mailed to him on January 7, 2009. (JX 58; D.I. 185 at. ¶ 32; D.I. 186 at ¶ 77.) The mark-up identified seven of the Cato Prospects, including Hudson Bay, Cranshire, and Iroquois, as overlapping with a list provided to Hemispherx by another agent. (JX 58; D.I. 185 at ¶ 32; D.I. 186 at ¶¶ 78-79.) Mr. Pambianchi struck four of the seven Cato Prospects, including Cranshire, off the list and suggested that Cato Capital split with the other agent the fees for the remaining three Cato Prospects, including Hudson Bay and Iroquois. (*Id.*) The parties disagree about Mr.

Pambianchi's motives in revising the list and also about the representations that Mr. Pambianchi and Mr. Lax made to each other in a subsequent call. As discussed below, however, these matters are immaterial to resolution of the claims in this case.

## G. The End of the Agreement's Term

In January 2009, Cato Capital approached Centurion in much the same way as it had approached Iroquois, Hudson Bay, and Cranshire. (Tr. 130:10-20.) Discussions with Centurion proved unfruitful at this point, however. (*Id.*) By March 2009, the end of the Agreement's term was near, but Cato Capital had yet to raise any capital for Hemispherx. (*Id.* at 130:20-131:2.) At this point, Mr. Hulse called Mr. Lax to ask that Mr. Lax "reignite" his efforts to raise capital. (*Id.*; D.I. 185 at ¶ 51.) Though the Agreement's term had yet to end, the evidence suggests that Cato Capital had ceased its efforts to find funding for Hemispherx and resumed its efforts only at Mr. Hulse's prodding. (Tr. 129:21-130:3, 130:20-131:11, and132:12-21; JX 2.) Mr. Lax suggested that Cato Capital approach Centurion again because Centurion was the "one remaining option." (Tr. 131:3-15.) Indeed, as Mr. Lax testified at trial, he did not believe that any of the other Cato Prospects could result in a transaction and "there was nothing really alive other than Centurion at one point was interested and we couldn't get over the NDA issue." (*Id.* at 129:21-130:3.)

Since Hemispherx was desperate for capital, (*Id.* at 129:21-24), Mr. Hulse prepared information to share with Centurion and authorized Mr. Lax to attempt to revive Centurion's interest. (*Id.* at 129:16-134:4; D.I. 185 at ¶ 51.) Mr. Lax complied with Mr. Hulse's request and contacted Ezra Friedberg ("Mr. Friedberg") at Centurion. (Tr. 133:22-134:4; D.I. 185 at ¶ 51.) After some discussion about the execution of a nondisclosure agreement, Mr. Lax arranged for Dr. Carter to meet with Mr. Friedberg in April 2009. (*Id.* at 133:22-138:6; D.I. 185 at ¶ 52.) The term of the Engagement Letter had expired approximately two weeks earlier, but Cato Capital

11

continued to work on securing a transaction with Centurion. (*Id.* at 136:20-25, 137:19-22; D.I. 185 at ¶ 52.) Ultimately, Hemispherx rejected Centurion's offer and Cato Capital's efforts came to naught. (JX 75; Tr. 138:17-140:3.)

On March 24, 2009, the term of the Agreement ended. (JX 26 at ¶ 3.) Paragraph 2(b) of the Agreement stated that Cato Capital should designate at the end of the term the Cato Prospects for which it expected payment during the tail period. (*Id.* at ¶ 2(b).) Despite this provision, Cato Capital did not send Hemispherx a list at the end of the term. (D.I. 185 at ¶ 53; D.I. 186 at ¶ 87.)

## H. Events During the Tail Period

On or around April 30, 2009, Dr. Bowen, the head of health care banking at Rodman and Renshaw ("Rodman"), contacted Dr. Carter. (Tr. 450:21-451:20.) Rodman was a bank specializing in PIPE transactions and the bank had a longstanding relationship with Hemispherx. (*Id.*) Dr. Bowen reached out to Dr. Carter because, as a result of recent publications in the public health field highlighting the risk of pandemic influenza, interest in companies with products capable of treating influenza was very high. (*Id.* at 451:8-20, 465:1-6.) Hemispherx was developing a new influenza product and the increased market interest resulted in Hemispherx's stock rapidly rising by several hundred percent. (*Id.* at 451:19-20; D.I. 185 at ¶ 58.) Dr. Bowen informed Dr. Carter that he believed Hemispherx could successfully secure an investor in an equity offering. (*Id.*) Accordingly, Hemispherx and Rodman executed an engagement letter around May 8, 2009. (*Id.* at 451:22; JX 65.) At trial, Dr. Carter testified that Rodman did not disclose to Hemispherx which investors Rodman intended to approach until after the parties had signed the engagement letter. (Tr. 451:23-452:6, 453:19-24.) Dr. Carter also claimed that, in engaging Rodman, Hemispherx relied on the fact that Cato Capital had not provided a paragraph 2(b) list, suggesting that Cato Capital would not seek payment for any prospects. (*Id.* at 453:1-17 (Explaining that "[i]f we had a list that suggested parties that were still within the tail period,

12

we would have advised Rodman and Renshaw not to contact them for the investment because that would have opened us up to a double fee proposal.").) Soon after Rodman and Hemispherx signed the engagement letter, Hudson Bay made a $7.5 million equity investment in Hemispherx on May 10, 2009 with Rodman acting as facilitator for the transaction. (*Id.* at 453:25-454:3; JX 66.) Hemispherx remitted payment to Rodman immediately. (*Id.* at 454:4-12; JX 76.) On May 18, 2009, Rodman facilitated two additional equity investments in Hemispherx of $8 million each by Cranshire and Iroquois. (Tr. 454:13-20; JX 66.) Hemispherx paid Rodman again for facilitating this second traunch. (*Id.* at 454:17-455:6; JX 77.) Dr. Carter testified that neither Hemispherx nor Sage suggested Iroquois, Cranshire, or any potential investors to Rodman. (Tr. 452:7-10, 455:7-22.)

On May 22, 2009, Cato Capital sent Hemispherx a demand letter seeking fees for the transactions that Hemispherx had concluded with Hudson Bay, Iroquois and Cranshire. (JX 70.) Hemispherx determined that Cato Capital was not entitled to any of the fees because it had not submitted a paragraph 2(b) list and had not been responsible for the transactions concluded. (Tr. 456:11-19.) Accordingly, Hemispherx refused to pay Cato Capital. (JX 137.)

## III. DISCUSSION AND CONCLUSIONS OF LAW

### A. BREACH OF CONTRACT

Cato Capital alleges that Hemispherx breached the Agreement by failing to pay it for the equity investments that Cranshire, Iroquois, and Hudson Bay in Hemispherx made in May 2009. (D.I. 185 at ¶ 2.) Hemispherx contends, however, that Cato Capital was not entitled to these fees for two reasons. First, Hemispherx points out that Paragraph 2(b) of the Agreement required Cato Capital to provide Hemispherx with a list of prospects for which Cato Capital expected to be paid in the tail period. (D.I. 186 at ¶¶ 14-16.) Thus, Hemispherx contends, because Cato Capital failed to provide such a list, it breached a material term of the Agreement and is not

13

entitled to payment. (*Id.* at ¶ 26.) Second, Hemispherx argues that Cato Capital was entitled to payment under the contract only for those transactions that resulted from its efforts. (*Id.* at 36-37.) Thus, Hemispherx reasons, becaus the equity investments that Cranshire, Iroquois, and Hudson Bay made in Hemispherx did not result from Cato Capital's efforts, Cato Capital is not entitled to payment. (*Id.* at ¶ 52.) The court concludes that Hemispherx is correct and that Cato Capital is not entitled to payment both because it failed to comply with the unambiguous terms of paragraph 2(b) of the Agreement and because Cato Capital did not cause the equity investments that the three investors made in Hemispherx.

The court interprets the Agreement in accordance with Delaware law. Under Delaware law, contract interpretation is a question of law, *see Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992), and the role of the court is to effectuate the parties' intent, *see Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). When interpreting a contract, the court must first determine whether there is any ambiguity in the contract. *See Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996). Where the contract is clear and unambiguous, the court must then ascertain the parties' intent by giving the words of the contract their "ordinary and usual meaning." *Id.* In short, "[c]ontract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1128, 1232 (Del. 1997). A court may consider extrinsic or parol evidence to determine the parties intent only when a contract is ambiguous. *Id.* A contract is not ambiguous merely because the parties disagree about its meaning. *See Harrah's Entm't, Inc. v. JCC Holding Co.*, 802 A.2d 294, 309 (Del. Ch. 2002).

14

## 1. Condition Precedent

### a. Paragraph 2(b) Created a Material Condition Precedent

The pertinent provision of paragraph 2(b) states: "At the end of the term of this Agreement, Cato shall designate in writing to the Company all Cato Prospects. Cato will only be entitled to Placement Fees for Transactions during the Tail Period completed with any of the listed Cato Prospects or their affiliates." (JX 26 at ¶ 2(b).) Cato Capital contends that this language created a promise, rather than a condition precedent, because it supposedly contains no conditional language. (D.I. 185 at ¶ 12.) As support for its contention, Cato Capital cites case law that it characterizes as requiring specific language in order for a condition precedent to exist and argues that such language is not present in the Agreement. (D.I. 185 at ¶¶ 8-10.) In response, Hemispherx contends that paragraph 2(b)'s words are clearly conditional because they make clear that Cato Capital was required to provide Hemispherx a list of prospects at the end of the term in order for Hemispherx to be required to pay Cato Capital a placement fee during the tail period.

The court concludes that the language of paragraph 2(b) of the Engagement Letter is clear and unambiguous, and created a condition precedent with which Cato Capital was obligated to comply in order to be entitled to payment. A condition precedent is "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." *ASM Puerto Rico, L.P. v. Alstom Power, Inc.*, 429 F. Supp. 2d 713, 717 (D. Del. 2006) (citation omitted). There are no particular words that must be used in order to create a condition precedent.[9] *Global Energy Finance LLC v. Peabody Energy Corp.*, No. 08C-10-129 RRC, 2010

---

[9]     The court is troubled by Cato Capital's mischaracterization of the case law on this point. For instance, citing *Global Energy Finance LLC v. Peabody Energy Corporation*, No. 08C-10-129 RRC, 2010 WL 4056164, at *24 (Del. Super. Oct. 14, 2010), as support, Cato Capital argues that "[s]pecific language must be used to create a condition precedent." D.I. 185 at ¶ 9. The text of *Global Energy Finance* clearly contradicts Cato Capital's

15

WL 4056164, at *24 (Del. Super. Oct. 14, 2010). Words such as "if, provided that, on the condition that" can be useful to establishing that the parties intended a condition, not a promise, but any phrase that conditions performance suffices. *See ASM Puerto Rico*, 429 F. Supp. 2d at 717. The words "shall" and "will only" in the Agreement make clear that only by providing the list of prospects to Hemispherx at the end of the Agreement's term could Cato Capital become eligible for placement fees. (JX 26 at ¶ 2(b) (stating that "Cato *shall* designate in writing to the Company all Cato Prospects" and that "Cato *will only* be entitled to Placement Fees for Transactions during the Tail Period") (emphasis added). Thus, those words create a condition precedent.

Not only did paragraph 2(b) create a condition precedent, but also this condition precedent was a material requirement of the Agreement. The purpose of the list was to give Hemispherx notice of the prospects for which Cato Capital would seek payment should a transaction with those prospects be completed during the tail period. (JX 26 at ¶ 2(b); Tr. 222:18-25; D.I. 186 at ¶¶ 25-26.) Since only after receiving the list could Hemispherx know with certainty the full scope of its obligations under the Agreement, Cato Capital's delivery of a prospect list at the end of the Agreement's term is a material requirement of the Agreement. In addition, Cato's failure to provide the paragraph 2(b) list deprived Hemispherx of the ability to determine with certainty the investors for which Cato Capital would demand fees and for which Hemispherx could not engage another agent. Consequently, Cato Capital's failure to comply with this material requirement was a material breach of the Agreement. *See Preferred*

---

assertion, however, and states plainly that "no particular words are necessary for the existence of a condition[.]" *Global Energy*, 2010 WL 4056164 at *24. Likewise, Cato Capital cites *ASM Puerto Rico, L.P. v. Alstom Power, Incorporated*, 429 F. Supp. 2d 713, 717 (D. Del. 2006), for the proposition that "[a] condition precedent 'must be expressed in clear language or it will be construed as a promise.'" A glance at the text of the case makes clear that the quoted portion of the case is referring to the requirements of Pennsylvania law, not the Delaware law that governs the instant case. *See ASM Puerto Rico*, 429 F. Supp. 2d at 717 (Stating that "[u]nder Pennsylvania law, a condition precedent must be expressed in clear language or it will be construed as a promise.") (Emphasis added).

16

*Investment Svcs., Inc. v. T&H Bail Bonds, Inc.*, No. 5886-VCP, 2013 Del. Ch. LEXIS 190, at \*37 (Del. Ch. Jul. 24, 2013) (Explaining that a material breach is one that goes "to the root or 'essence' of the agreement between the parties[.]") (Citations omitted).

## b. Cato Capital's Substantial Compliance with Paragraph 2(b)

Cato Capital contends that even if paragraph 2(b) created a condition precedent to Cato Capital's entitlement to a fee, Cato Capital substantially complied with this requirement by providing Hemispherx an updated list of prospects in January 2009.[10] (D.I. 185 at ¶ 13.) The court concludes, however, that Cato Capital did not substantially comply with paragraph 2(b) in January 2009. The evidence strongly indicates that the January 2009 list was an updated paragraph 2(c) list and neither fulfilled nor was intended to fulfill the requirements of paragraph 2(b).

As discussed above, the Agreement requires for two different lists. (JX 26 at ¶ 2(b) and 2(c).) One, governed by paragraph 2(c), was a list of contacts that Hemispherx gave Cato Capital its approval to contact on its behalf. The other, governed by paragraph 2(b), was a list of prospects for which Cato Capital expected to be paid if they invested in Hemispherx during the tail period of the Agreement. In short, the two lists are provided for by different terms of the Agreement and serve entirely different purposes.

It is undisputed that Mr. Lax sent Mr. Pambianchi a list of Cato Prospects on November 24, 2008 pursuant to paragraph 2(c) of the Agreement. (JX 25.) On November 30, 2008, Mr.

---

[10] In its Proposed Findings of Fact and Conclusions of Law, Cato Capital conflates two distinct arguments regarding paragraph 2(b)'s validity and Cato Capital's compliance. On the one hand, by arguing that it substantially complied with the terms of paragraph 2(b), Cato Capital implicitly acknowledges that it was bound by paragraph 2(b). (D.I. 185 at ¶ 13.) Accordingly, Cato Capital argues that it proceeded to fulfill the requirements of paragraph 2(b) by providing the January 2009 list. (*Id.*) On the other hand, Cato Capital simultaneously contends that, rather than fulfilling paragraph 2(b)'s requirements, the January 2009 list obviated and rendered redundant paragraph 2(b)'s requirement of an end of term list. (*Id.*) This second argument suggests, in contrast to the first, that Cato Capital was no longer required to comply with paragraph 2(b)'s requirements because the January 2009 list destroyed any usefulness that the end of the term list would have had. The court will address these two arguments separately.

17

Lax sought and obtained Hemispherx's approval to update the paragraph 2(c) list of Cato Prospects. (JX 42.) Finally, on January 5, 2009, Mr. Lax sought permission again to update the paragraph 2(c) list of Cato Prospects. (JX 54.) A day later, Mr. Pambianchi informed Mr. Lax that this update was approved and asked Mr. Lax to send him a "full list, updated" of Cato Prospects. (*Id.*) At the time Mr. Lax made this request, there was no consolidated list of all of the approved investors. (D.I. 186 at ¶ 72.) Rather, the Cato Prospects were spread over the initial list that Mr. Lax had e-mailed Hemispherx on November 24, 2008 and Mr. Lax's subsequent e-mails. (*Id.*) These circumstances indicate that the list that Mr. Pambianchi was requesting was an updated paragraph 2(c) list, rather than a list for the purposes of paragraph 2(b).

When Mr. Lax sent Mr. Pambianchi the full list, he wrote simply: "Dr. Carter, attached please find the updated investor list." (JX 56.) He made no mention of having provided the list to apprise Hemispherx of the investors for which Cato Capital expected to receive payment should a transaction close in the tail period. In fact, there is no evidence at all, other than Mr. Lax's self-serving testimony at trial, (Tr. 127:3-129:1), that the list that Mr. Lax sent two and a half months before the end of the tail period was sent with compensation during the tail period in mind. Furthermore, when Harold Lindenthal, who like Mr. Lax was also a Managing Director of Cato Capital, wrote a letter on May 22, 2009 to demand that Hemispherx pay Cato Capital, he made no mention at all of any list having been provided for the purposes of paragraph 2(b). (JX 70; Tr. 224:9-225:2.) Mr. Lindenthal stated only that Cato Capital had provided Hemispherx with a list that complied with paragraph 2(c) of the Engagement Letter and was thus entitled to payment. (*Id.*) It was not until Cato Capital filed suit that it asserted that it had provided a list that met the purposes of paragraph 2(b) and thus, entitled it to payment under the Agreement.

18

(D.I. 46 at ¶ 11.) Thus, the Court concludes that the updated list that Mr. Lax provided on January 7, 2009 was a paragraph 2(c) list, not a paragraph 2(b) list that set forth the companies for which Cato Capital expected to receive fees during the tail period.

### c. Redundancy of the Paragraph 2(b) List

Another argument that Cato Capital makes is that the list of updated prospects that Mr. Lax submitted to Mr. Pambianchi on January 7, 2009 was identical to the list that Mr. Lax would have sent Hemispherx at the end of the term. (D.I. 185 at ¶¶ 13-14.) Thus, Cato Capital argues, there was no need to resend the same list containing redundant information to Hemispherx at the end of the term.[11] (*Id.*) The court finds this argument implausible and concludes that the list that Cato Capital supplied pursuant to paragraph 2(c) did not render redundant the list required by paragraph 2(b).

First, the terms of the Agreement plainly require two different lists to be provided at two different times. (JX 26 at ¶ 2(b)-(c).) Under Delaware law, the court must "give each provision and term effect, so as not to render any part of the contract mere surplusage." *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 397 (Del. 2010). Indeed, Delaware courts have long held that "an interpretation that gives effect to each term of an agreement is preferable to any

---

[11]     In support of its contentions, Cato Capital cites a number of decisions from jurisdictions outside Delaware and outside the Third Circuit that do not apply Delaware law. *See, e.g.*, *Scott-Macon Secs., Inc. v. Zoltek Cos., Inc.*, No. 06-2711-cv, 2007 WL 2914873, at *2-3 (2d Cir. Oct. 4, 2007) (affirming district court's ruling that the plaintiff did not have to provide a prospect list at the end of the term where the defendant had already materially breached the agreement long before agreement's termination); *Sunset Gold Realty v. Premier Bldg. & Dev. Corp.*, No. CV095027657S, 2010 WL 2927352, at *3 (Conn. Super. Ct. 2010) (finding that the broker's right to payment arose during the term of the agreement and thus, a prospect list provision regarding payment during the tail period was not relevant); *DeForest Indus., Inc. v. Gaetano*, 461 A.2d 453, 453-57 (Conn. Super. Ct. 1983) (holding that a requirement that the defendant be notified of clients' identities was fulfilled because the defendant had met the client at the beginning of the contract and negotiations with the client had been continuous throughout the term of the agreement until a lease with the client was executed); *Gundaker v. Templer*, 560 S.W.2d 306, 309 (Mo. Ct. App. 1977) (finding substantial compliance with a provision requiring that the defendant be notified of any customer whom the plaintiff had contacted where the plaintiff provided the defendant with a written offer identifying the customer, rather than a list). These cases are inapposite. None of the cases cited addresses whether supplying a contact list to obtain pre-approval during the term of an agreement under one provision nullifies a different provision calling for a second list specifying the contacts, if any, for which payment is expected in the tail period.

interpretation that would result in a conclusion that some terms are uselessly repetitive."[12] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) (citations omitted). Thus, a reading of the Agreement that would nullify paragraph 2(b)'s explicit requirements is inconsistent with Delaware law.

Second, Mr. Lax's own testimony at trial strongly suggests that Cato Capital failed to send the paragraph 2(c) list not because the list was redundant, but rather because, as Hemispherx contends, (D.I. 186 at ¶ 91), th ere were no prospects for which Cato Capital expected to be paid in the tail period. Mr. Lax testified at trial that he considered sending Hemispherx a list, but decided against doing so because he believed that the list was unnecessary. (Tr. 206:15-209:4.) He claimed that he believed Hemispherx was "on notice" of the prospects for which Cato Capital expected payment in the tail period because "[w]e had a discussion." (Tr. 208:10-18.) Mr. Lax's testimony was vague regarding when the discussion supposedly took place and what exactly he told Hemispherx and its representatives during this discussion, however. Mr. Lax also contradicted himself by admitting that he did not ever tell Mr. Pambianchi or Dr. Carter that he did not intend to send them a list at the end of the Agreement's term. (Tr. 206:25-207:20.) Moreover, Mr. Lax conceded that by March 2009, he had little hope that any of the companies designated Cato Prospects would invest in Hemispherx. (Tr. 129:21-130:3; 208:24-209:4.) A last ditch effort to interest Centurion in Hemispherx was Cato Capital's last hope. (*Id.*; Tr. 131:3-15.) It follows from Mr. Lax's admission that there could not have

---

[12] This is the case even if, as Cato Capital argues, enforcing all the terms of the Agreement would result in a forfeiture. *AES Puerto Rico, L.P.*, 429 F. Supp. 2d at 717 (explaining that conditions precedent may work a forfeiture, but "if the language of the contract is plain and unambiguous, a court should construe the contract according to its terms.") Here, it is not clear at all that the plain language of the Agreement would work a forfeiture. Cato Capital's efforts regarding Hudson Bay, Cranshire Capital, and Iroquois were hardly extensive and laborious. Cato Capital obtained the list of prospects on its contact list from Mr. Harstein, a friend of Mr. Lax's. (Tr. 181:19-182:15.) Cato Capital then made one call and sent one e-mail each to Hudson Bay and Cranshire Capital, meeting with no interest at all from those companies. Regarding Iroquois, Cato Capital's efforts with Iroquois quickly ended when the meeting that Cato Capital arranged did not result in an acceptable offer.

been any names, other than perhaps Centurion, for Mr. Lax to place on the paragraph 2(b) list as Cato prospects likely to invest in Hemispherx during the tail period. Certainly, Mr. Lax had no reason to expect investments by Iroquois, Hudson Bay, and Cranshire. He had not had any contact with them since December 2008 when they all either rejected the possibility of investing in Hemispherx or were rejected by Hemispherx. (D.I. 185 at ¶ 48-50; Tr. 198:12-199:2; 206:11-14.)

### d. Waiver of Paragraph 2(b)'s Requirements

Cato Capital's argument that Hemispherx waived the requirements of paragraph 2(b) by not requesting the end-of-term list is unavailing. In support of its argument, Cato Capital offers two facts. First, Hemispherx permitted Cato Capital to continue work on securing an investment from Centurion after the term of the Agreement had ended. (D.I. 185 at ¶ 16-18.) Second, Dr. Carter testified at trial that he would have paid Cato Capital a fee under the Agreement had Centurion invested in Hemispherx during the tail period. (*Id.*; Tr. 467:24-468:13.) The court concludes that this is not enough to constitute waiver of paragraph 2(b)'s requirements for Cato Prospects other than Centurion. Under Delaware law, contractual requirements may be waived, but "the standards for proving waiver under Delaware law are 'quite exacting.'" *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005) ("The facts relied upon to prove waiver must be unequivocal.") The fact that Hemispherx was willing to pay for Cato Capital's work on Centurion does not unequivocally establish that Hemispherx intended to waive paragraph 2(b)'s requirements regarding Iroquois, Hudson Bay, and Cranshire.[13]

---

[13] As discussed above, all three companies were either rejected by Hemispherx or rejected Hemispherx themselves in December 2008. After that point, Cato Capital had no contact at all with those three companies and made no additional efforts to secure investments by those companies. It is very doubtful that Hemispherx intended to waive the requirements of paragraph 2(b) in regards to companies that had not been viable prospects for three months by the time the Agreement's term ended. Certainly, Cato Capital has not adduced any evidence suggesting otherwise.

21

## 2. Causal relationship

The court's ruling that Cato Capital materially breached the Agreement when it failed to comply with the condition precedent in paragraph 2(b) is sufficient to defeat Cato Capital's breach of contract claim. Even if Cato Capital had complied with paragraph 2(b), however, Cato Capital's breach of contract claim would still fail. The Agreement requires Cato Capital to have caused the investments in Hemispherx and the parties agree that Cato Capital was not the cause of any of the transactions.

Hemispherx contends that Cato Capital is not entitled to any fees pursuant to the Agreement because there was no causal relationship between Cato Capital's efforts and the transactions that occurred in May 2009. (D.I. 185 at ¶ 21; D.I. 186 at ¶ 37.) For its part, Cato Capital does not claim that its efforts had anything to do with the transactions through which Hemispherx secured capital in May 2009. (D.I. 185 at ¶ 21-27.) Cato Capital argues instead that the Agreement did not require it to cause the transactions and suggests that it is entitled to fees even though its efforts with Iroquois, Cranshire Capital, and Hudson Bay were short lived and unsuccessful. (D.I. 185 at ¶ 22-23.)

Since the language of the Agreement is unambiguous, the court construes it as an objective third party would understand it. A close reading of the Agreement makes clear that Cato Capital must have caused a transaction in order to be entitled to fees for it. The first line of the Agreement states that Hemispherx retained Cato Capital "in connection with facilitating debt and equity financings for the Company. . . ." (JX 26.) "Facilitate" is defined by Merriam-Webster Dictionary as "to help cause (something)" or "help bring about". (MERRIAM-WEBSTER (Oct. 3, 2013), http://www.merriam-webster.com/dictionary/facilitate.) Thus, the impression created by the Agreement's very first words is that Cato Capital must cause the financings

22

contemplated in the Agreement. This impression is further bolstered by next section of the Agreement titled "Services to be Provided by Cato." (JX 26 at ¶ 1.) The Agreement makes clear that in order to facilitate the capital raised, Cato Capital must assist the company in "screening and contacting prospective investors, assisting in negotiations...and advising and assisting the Company in structuring and pricing of placements or financings." (*Id.*)[14] This provision makes clear that it is not enough for Cato Capital to merely approach—in other words, screen and contact—the prospects. Rather, Cato Capital must participate throughout the process of securing the investment.

The second section of the Agreement titled "Compensation for Services" reinforces the notion that Cato Capital must facilitate the transactions in order to receive fees. Paragraph 2(a)(iv) states thrice that the equity or debt securities, the warrants for which are to be used to calculate Cato Capital's, fees must be "placed by Cato." The repetition in that provision suggests that the use of the phrase "placed by Cato" is not accidental and further establishes that Cato Capital, and not another agent, must have caused the debt or equity investment.

Although there is a dearth of Delaware cases addressing whether an agent must cause a transaction in order to be entitled to fees during the tail period of an agreement, the broker-dealer line of cases that Hemispherx cites in support of its position are instructive. Many jurisdictions require that brokers' efforts bear some causal relationship to the transactions for which they seek to collect fees. *See e.g.*, *Upper Cape Realty Corp. v. Morris*, 756 N.E.2d 1193, 1197 (Mass. App. Ct. 2001) (explaining that "introduce" requires "that the broker's actions have at least some

---

[14] In arguing that the Agreement does not require Cato Capital to cause anything", (D.I. 185 at ¶ 22), Cato Capital relies on the next full paragraph. That paragraph states, among other things, that "[i]t is understood by both parties that Cato intends to solicit interest from a limited number of investors on a 'best efforts' only basis." The "best efforts" provision cannot reasonably be read, however, as nullifying the language that precedes it. The "best efforts" standard provided by the Agreement informs the parties of the degree of effort required of Cato Capital, but the preceding paragraph still controls the services that Cato Capital is required to provide.

minimal causal connection with the sale, or in other words, be in the chain of causation leading to the sale"); *Snipes v. Marcene P. Powell & Associates*, Inc., 273 Ga App. 814, 818 (Ga. Ct. App. 2005) ("introduced" requires "that the broker's actions have at least some minimal causal connection with the sale, or be in the chain of causation leading to the sale"); *Korstad v. Hoffman*, 221 Cal. App. 2d Supp. 805, 809 (Cal. App. Dep't Super. Ct. 1963) ("in order to make out a reasonable construction of the contract there must have been at least some connection between the act and the sale").[15]

Even where investment bankers are characterized as finders, rather than brokers, many courts still require a causal connection. *See, e.g.*, *Antares Mgmt. LLC v. Galt Global Capital, Inc.*, No. 12-CV-6075 (TPG), 2013 WL 1209799, at \*7 (S.D.N.Y Mar. 22, 2013) ("Finders must demonstrate that the final deal which was carried through flowed directly from his introduction of the matter to be entitled to collect his fee."); *Sachs v. Lesser*, 163 P.3d 662, 670 (Utah Ct.

---

[15]     The cases that Cato Capital cites in support of its position are inapposite. First, all but one of the cases involve exclusive contracts. *See, e.g.*, *Deutsche Bank Securities Inc. v. Rhodes*, 578 F. Supp. 2d 652, 668 (S.D.N.Y. 2008) ("[plaintiff] agreed to be engaged only on an exclusive basis, and this purpose of the Addendum would best be effectuated by an interpretation that if defendants breached the addendum by using the services of another investment banking firm, [plaintiff] would be paid nonetheless); *CIBC World Markets Corp. v. Techtrader, Inc.*, 183 F. Supp. 2d 605, 607 (S.D.N.Y. 2001) (agreement stated that plaintiff was "exclusive financial advisor to the Company"); *Lazard Freres & Co. v. Crown Sterling Mgmt., Inc.*, 901 F. Supp. 133, 137 (S.D.N.Y. 1995) (agreement provided that plaintiff was to serve as "exclusive investment banker and financial advisor").

Second, the agreements in question in each case expressly provide that the agents in question did not have to do anything to be entitled to payment. *See, e.g.*, *Deutsche Bank*, 578 F. Supp. 2d at 668 (explaining that the contract's terms "'in connection with *any* such bank financing' [and] 'in the event of a closing of *any* facility'...strongly suggest that [plaintiff] did not have to be involved in the closing for it to be entitled to a fee") (emphasis in original); *CIBC World Markets Corp.*, 183 F. Supp. 2d at 611 (plaintiff entitled to fee because agreement provided that "[a]ll that must occur is that a qualifying Transaction be 'consummated' or 'entered into' by [defendant]"); *Lazard Freres*, 901 F. Supp. at 137 (agreement "specifically provided that [plaintiff] would be entitled to its fees if the Client successfully restructured their debts, even if [plaintiff] was not responsible for the debt restructuring."); *Painewebber Inc. v. Campeau Corp.*, 670 F. Supp. 100, 106 (S.D.N.Y. 1987) (plaintiff entitled to fee where agreement did not condition plaintiff's right to payment upon rendering of services).

In the instant case, both parties knew from the inception of the Agreement that it was nonexclusive. In addition, the Agreement expressly provides for responsibilities, separate and apart from merely introducing potential investors, that Cato Capital must fulfill in order to be entitled to fees. (JX 26 at ¶¶ 1-2.) Both the nonexclusive nature of the Agreement and the Agreement's terms are most compatible with an interpretation that requires Cato Capital's efforts to have had some causal connection to the capital-raising transactions in order for Cato Capital to have earned a fee.

24

App. 2007) ("A business finder, therefore, becomes entitled to his fee 'if his introduction results in a transaction. . . ."); *Legros v. Tarr,* 540 N.E. 2d 257, 262-63 (Ohio 1989) ("[A] finder is entitled to a commission or fee only if his introduction results in a transaction" and the negotiations must be "connected to and stem from" the introduction). It would violate the terms of the Agreement and sheer common sense for the court to award Cato Capital fees for investments that it had nothing to do with.

## B. FRAUDULENT INDUCEMENT CLAIM AGAINST HEMISPHERX

In addition to its breach of contract claim, Cato also alleges that Hemispherx fraudulently induced Cato to enter into the agreement and continue performing under the agreement. (D.I. 185 at ¶¶ 29, 31.) Specifically, Cato contends that "Hemispherx misled CATO: (1) at the inception of the Agreement, when it did not tell CATO that another investment bank was pursuing the same investors at the same time as CATO; (2) in January 2009 when it confirmed that CATO would be paid for any transactions consummated with a CATO Prospect even though another investment bank had pursued some of the same potential investors; and (3) in March-April 2009 when it asked CATO to reach out to CATO Prospects, beyond the term of the engagement, to attempt to obtain financing." (D.I. 185 at ¶ 32.) For the following reasons, the court concludes that Cato has not established its fraudulent inducement cause of action against Hemispherx.

### 1. Fraudulent Inducement at the Outset

In order to establish fraudulent inducement, a plaintiff must demonstrate that: (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the

25

plaintiff was injured by its reliance." *See, e.g.*, *DCV Holdings, Inc. v. ConAgra Holding, Inc.*, 889 A.2d 954, 958 (Del. 2005). In support of its allegation that Hemispherx committed fraud at the inception of the agreement, Cato points to Mr. Lax's testimony at trial in which he testified that if he had known that another investment banker was pursuing the same Cato prospects, Cato would not have entered into the agreement. (D.I. 185 at ¶ 33.) Thus, Cato essentially argues, Hemispherx's employment of Mid-South was a material fact that Hemispherx deliberately withheld in order to induce Cato to enter the agreement. (*Id.*) Mr. Lax's self-serving assertions notwithstanding, Cato has failed to establish fraudulent inducement at the outset of the agreement. There is no evidence at all contemporaneous with the signing of the agreement that indicates that Cato expected that Hemispherx would refrain from hiring any other investment banker. None of the e-mails memorializing their negotiations offer an indication that Cato expected exclusivity. If anything, the record suggests that Cato should have been aware that Hemispherx could retain another banker. As Mr. Lax conceded at trial, the agreement was nonexclusive. (Tr. 215:9-14; D.I. 185 at ¶ 33.) He also admitted that he knew that Hemispherx might be dealing with other agents. (Tr. 215:12-14.)[16] Apart from the dearth of evidence to support Cato's assertion that it reasonably believed Hemispherx would not hire another agent, Cato also offers no evidence at all, beside mere conjecture, (D.I. 185 at ¶ 33, FN 14), to establish that at the outset of the agreement or during the agreement, Sage and Hemispherx did not intend to perform or pay Cato.

---

[16]     Mr. Lax could hardly claim otherwise in light of the evidence. While the negotiations and drafts leading up to execution of the Engagement Letter are not relevant to interpretation of its unambiguous terms, the negotiations are indeed relevant to what the parties generally knew. As noted above, the first draft of paragraph 2(c) that Hemispherx sent Cato Capital required Hemispherx to immediately inform Cato Capital if any of the investors that Cato Capital sought to contact "has been or soon will be contacted by Company or any of its representatives". (JX 20 at ¶ 2(c) (emphasis added); D.I. 185 at FN 5; D.I. 186 at ¶¶ 35-36). Although Cato Capital objected to this language and had it removed, (*Id.*), this language, taken with the non-exclusive nature of the engagement, should have alerted Cato Capital that Hemispherx was at least contemplating another agent.

26

## 2. Fraudulent Inducement in January 2009

The record contradicts Cato's allegation that Hemispherx fraudulently induced its continued performance in January 2009 by not disclosing that Hemispherx had hired Mid-South and by promising to pay Cato for any transactions concluded with any Cato prospect. First, the record suggests that Mr. Lax knew by January 2009 that Hemispherx had retained another agent to work simultaneously with Cato. As previously discussed, Mr. Lax admitted at trial that he knew that Hemispherx was at least contemplating reaching out to other agents. (*Id.*) In addition, at least one of the prospective investors designated Cato prospects informed Mr. Lax that Hemispherx had another agent. (Goodman Dep. 95:15-95:3; D.I. 185 at ¶ 50; D.I. 186 at ¶¶ 56-60.) At his deposition, Mr. Goodman testified that when Mr. Lax called him at Cranshire in December 2008, Mr. Goodman flatly stated that he had already seen and rejected the very same transaction that Mr. Lax was proposing. (*Id.*) The parties have offered no reason to doubt Mr. Goodman's testimony.

Moreover, in an e-mail dated January 5, 2009 e-mail, Mr. Lax suggested he was aware that Hemispherx had retained another agent, writing: "If you can please confirm that these groups are permitted investors[,] I would appreciate it. They had not seen the transaction yet but may have been part of the *other agents* list." (JX 54. (Emphasis added.)) At trial, Mr. Lax claimed that by "other agents", he was referring to the possibility that another agent may have sought capital for Hemispherx long before Cato Capital began work and this other agent may have had a tail period that extended through January 2009. (Tr. 218:22-220:21.) In contrast to Mr. Lax's convoluted explanation, Hemispherx offers a more straightforward meaning of Mr. Lax's words. As Dr. Carter testified at trial, Hemispherx contends that Mr. Lax made reference to "other agents" because Mr. Lax was fully aware that Hemispherx had retained at least one

27

other agent to approach investors at the same time as Cato Capital. (D.I. 186 at ¶ 76; 365:5-13.) The court finds Dr. Carter's account credible in light of the record as a whole.

Second, there is no evidence, apart from Cato Capital's self-interested account, that Hemispherx knowingly misled Cato Capital when it allegedly promised to pay Cato Capital for any investment during the tail period by the Cato prospects designated in January 2009. Cato Capital claims that the parties understood that the list of prospects that Mr. Lax sent Mr. Pambianchi on January 7, 2009 bound Hemispherx to pay Cato Capital for any transactions completed with those prospects during the tail period of the Agreement. (D.I. 46 at ¶¶ 16, 18; D.I. 185 at ¶¶ 40, 53-54; Tr. 222:18-20.) Hemispherx argues, however, that the list merely detailed the prospects that Cato Capital could contact pursuant to paragraph 2(c). (D.I. 186 at ¶ 74.) The court need not resolve which account is factually correct because it is well established that "[t]he failure to fulfill a promise to perform future acts is not ground for a fraud action unless there existed an intent not to perform at the time the promise was made." *Scott-Macon Secs., Inc. v. Zoltek Cos.*, No. 04 Civ. 2124 (MBM), 2005 U.S. Dist. LEXIS 9034, at *29-30 (S.D.N.Y. May 11, 2005) (Concluding that "there is no trial-worthy issue as to Zoltek's claim of fraudulent inducement.") (Quoting *Stamelman v. Fleishman-Hillard, Inc.*, No. 02 Civ. 8318 (SAS), 2004 U.S. Dist. LEXIS 14667, at *3 (S.D.N.Y. July 29, 2004)); *see also Deerfield Commc'ns v. Chesebrough-Ponds, Inc.*, 502 N.E. 2d 1003 (N.Y. 1986) (Distinguishing between "promissory statements as to what will be done in the future," which permit only a breach of contract claim, and "false representations of fact," which give rise to a fraudulent inducement cause of action.) Thus, even if Hemispherx did indeed promise to pay Cato Capital for any transaction completed in the tail period with the prospects on Mr. Lax's January 7, 2009 list, there is no fraudulent inducement unless Cato Capital can establish that Hemispherx had no

28

intention at the time it made this promise to make good on this undertaking. Cato Capital has not introduced any evidence establishing this and has not even made this assertion. (D.I. 185 at ¶ 34 (Stating only that "Hemispherx, through Sage, confirmed that CATO would be paid for any investments made by a CATO Prospect either during the term of the agreement or during the Tail Period.").)

### 3. Fraudulent Inducement at the End of the Agreement

Cato Capital alleges that Hemispherx is liable for fraudulent inducement in the tail period of the agreement because "Hemispherx explicitly asked CATO to continue to solicit interest from a CATO Prospect, Centurion, after the end of the active term of the Agreement." (D.I. 185 at ¶¶ 32, 36.) A mere request that Cato Capital continue working does not in itself constitute fraudulent inducement, however, and Cato Capital has not pointed to any evidence that can establish fraudulent inducement during the tail period.

### C. FRAUD CLAIM AGAINST SAGE

Cato Capital contends that for the same reasons for which Hemispherx is liable for fraud, Sage is also liable for fraud. (D.I. 185 at ¶¶ 38-39.) As discussed above, however, *see supra* Part III.B., the court concludes that Cato Capital has not demonstrated that Hemispherx acted fraudulently. Because Cato Capital has not adduced any evidence in support of its fraud claim against Sage beyond that which the court has already reviewed and found lacking, the court concludes that Cato Capital's fraud claim against Sage must also fail.

### D. INTENTIONAL INTERFERENCE CLAIM AGAINST SAGE

Because Sage acted as Hemispherx's agent at all times, Cato Capital has relinquished its intentional interference claim and instead concedes that "Sage, by law, could not have interfered with Hemispherx's Agreement with CATO" and requests that "CATO's claim against Sage for intentional interference with the Agreement will be dismissed." (D.I. 185 at ¶¶ 40-41.) The

29

court grants Cato's request and dismisses this claim.

## IV. CONCLUSION

For the reasons stated above, the court concludes that (1) Hemispherx is not liable for breach of contract and also is not liable for fraudulent inducement; (2) Sage is not liable for fraud and also is not liable for intentional interference with contractual relationship; and (3) Cato Capital is not entitled to damages and attorneys' fees. Accordingly, Cato Capital's claims are dismissed in their entirety.

Dated: September 29, 2014

UNITED STATES DISTRICT JUDGE

30